MATTHEW J. GULDE
guldem@sec.gov
SECURITIES AND EXCHANGE COMMISSION
801 Cherry Street, Unit #18
Fort Worth, TX 76102-6882
Ph: 817-978-3821

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                                        **Plaintiff,**<br><br>                        **v.**<br><br>**CHRISTOPHER J. SPENCER and JOHN BUSSHAUS**<br><br>                                        **Defendants.** | **Case No.  1:19-cv-9070** |

**COMPLAINT**

Plaintiff Securities and Exchange Commission ("SEC" or "Commission"), for its complaint against defendants CHRISTOPHER J. SPENCER and JOHN BUSSHAUS (together, "Defendants"), alleges as follows:

**SUMMARY OF ALLEGATIONS**

1.      Between 2012 and 2013, Defendants Christopher J. Spencer ("Spencer") and John Busshaus ("Busshaus"), acting negligently, used a series of false and misleading representations about the capabilities and growth prospects of a central component of FAB Universal Corp. ("FAB")'s business in China.  Spencer and Busshaus, FAB's CEO/President and CFO, respectively, repeatedly represented to FAB's investors that Intelligent Media Kiosks ("Kiosks") were a key component of FAB's business model.  In press releases, earnings calls and FAB's

public reports, Spencer and Busshaus described the Kiosks as ATM-style terminals where customers could download movies, television shows, music, and other media to their cellphones and other devices. The Defendants described the business model as "iTunes meets Redbox meets Netflix" and made numerous statements about the multi-media functionality, profitability, and growth of the Kiosk market.

2.      In reality, almost all of FAB's Kiosks did not have the claimed media-download functionality, and more than half of the Kiosks did not function at all. Furthermore, public statements reviewed and approved (and in some cases signed and certified) by Spencer and Busshaus grossly overstated the number of installed Kiosks, thereby misleading investors about their purported revenue-generating ability and prospects.

3.      Spencer and Busshaus received and reviewed information provided by FAB's personnel located in China prior to making these representations. However, Spencer and Busshaus failed to adequately address numerous red flags arising from the information that they received  and thus did not comply with the requisite standard of care before making or approving these and other representations.

4.      During the relevant period, Spencer and Busshaus sold hundreds of thousands of shares of FAB common stock at artificially inflated prices. FAB's stock price dropped significantly after a market analyst (who held a short-position in the company's stock) published a report detailing serious issues with FAB's Kiosk business and other aspects of the business.

5.      By virtue of the conduct alleged herein, Spencer and Busshaus have violated Sections 17(a)(2) and (3) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a)(2) and (3). Unless Defendants are enjoined by the Court, they will continue to violate these provisions of the federal securities laws.

6.      To protect the public from further harm and violations of the securities laws, the

SEC seeks: (i) a permanent injunctions against both Defendants; (ii) disgorgement of all ill-

gotten gains from the unlawful activity set forth in this Complaint, together with prejudgment

interest; and (iii) civil penalties pursuant to Section 20(d) of the Securities Act.

### JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action under Sections 20(b) and 22(a) of the

Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)], because, at all relevant times, FAB's stock was

publicly-traded on the New York Stock Exchange ("NYSE") and because the Defendants

directly or indirectly made use of the means or instrumentalities of commerce and the mails in

connection with the transactions described herein.  The Commission seeks the imposition of civil

penalties pursuant to Section 20(d)(2)(C) of the Securities Act [15 U.S.C. §77t(d)].

8.      Venue is proper in this Court under Section 22(a) of the Securities Act [15 U.S.C.

§ 77v(a)], because certain of Defendants' acts, practices, transactions, and courses of business

alleged herein occurred within the Southern District of New York and were effected, directly or

indirectly, by making use of means or instrumentalities of transportation or communication in

interstate commerce, or the mails, or the facilities of the NYSE, which is located in the Southern

District of New York.  In addition, some of FAB's largest shareholders had their principal

offices in New York, New York.

### DEFENDANTS

9.      Christopher J. Spencer, age 50, currently resides in Florida.  Spencer served as

FAB's CEO, President, and as a director from February 7, 2001.  From 1994 until 1996, Spencer

worked for a technology company engaged in financial remittance between international

locations and China.  Spencer is currently serving as the CEO of a public company spun out of FAB.

10.    John Busshaus, age 56, currently resides in Pennsylvania.  Busshaus served as FAB's Controller from April 2006 and Chief Financial Officer ("CFO") from January 29, 2007. Busshaus has a degree in accounting from Clarion University of Pennsylvania and holds a CPA license, which has been inactive since 2013.  He is also a former broker and holds inactive Series 6, 7, and 63 licenses.  He was last associated with a registered broker-dealer in 2009. Busshaus is currently serving as the CFO of a public company spun out of FAB.

## RELEVANT ENTITY

11.    FAB, formerly known as Wizzard Software Corp. ("Wizzard"), is a Colorado corporation with its headquarters in Pittsburgh, Pennsylvania.  Before acquiring its business in China, Wizzard was primarily engaged in podcast hosting and related services.  Wizzard acquired operations in China through a merger with Digital Entertainment International Ltd. ("DEI"), a Chinese-based distributor of digital entertainment.  Following the DEI transaction, Wizzard changed its name to FAB.  DEI's legacy operations in China formed FAB's principal business.  DEI's founder and CEO, who continued to lead the management of those operations from China, became FAB's Chairman.  Spencer and Busshaus continued as the CEO/President and CFO, respectively, of the combined Pittsburgh-based public company, with responsibility for, among other things, FAB's SEC filings and other public disclosures.  After the merger, FAB was purportedly engaged in the business of marketing and distributing digital entertainment products throughout China through its Digital Media Services, Retail Media Sales, and Wholesale Media Distribution units.  FAB's public statements described the company as "a global leader in digital media entertainment sales and distribution" that "delivers media to its

customers worldwide through Intelligent Kiosks, Retail Stores and Franchises, and online...."

"Sales of digital media are generated through the kiosks (sic) networks, subscription sales for

mobile devices, smartphone Apps and Netflix-like subscription models." FAB's common stock

was registered with the Commission pursuant to Section 12(b) of the Securities Exchange Act of

1934 (the "Exchange Act"). Its shares were listed on the NYSE until the NYSE delisted the

Company's shares on December 2, 2014.

## FACTUAL ALLEGATIONS

12.     In 2011 and 2012, Spencer and Busshaus were intimately involved in Wizzard's

due diligence on a possible merger with DEI. The Kiosk business was a key component of

DEI's operations, and Spencer and Busshaus intended for this business to be a strategic focus of

the new entity's business model.

13.     Wizzard hired two firms to conduct due diligence on the possible merger with

DEI: (i) a prominent "Big Four" professional services firm (the "International Accounting Firm")

to perform financial and accounting due diligence on DEI's China operations; and (ii) an

international China-based law firm (the "International Law Firm") to conduct legal due

diligence.

14.     During the diligence review, these firms identified multiple red flags for Spencer

and Busshaus regarding DEI's Kiosk business, including: (i) internal company documents

indicating that DEI may have sold far fewer Kiosks to customers than it claimed; (ii) DEI records

that reflected an inconsistency between the reported gross profit for the Kiosk business and the

amount of licensing fees incurred for digital content, including recording zero expenses for

licensed content (such as U.S.-based movies) it purportedly sold; and (iii) a lack of recurring

revenue from Kiosks purportedly located outside Beijing. After these firms flagged significant

concerns, DEI hired an international accounting and professional services firm ("DEI's Accounting Firm") to assist in the due diligence process.

15.     After receiving due diligence results from the International Accounting Firm, Spencer contacted a consultant based in China (the "Consultant"), who represented Wizzard in the negotiations with DEI, and a group of other advisors.  The Consultant and certain other advisors representing Wizzard in negotiations with DEI were retained on terms that would give them extra compensation in the form of stock of the merged entity if the Wizzard-DEI transaction closed.  They received FAB stock when the merger transaction was completed.

16.     On October 11, 2011, Spencer sent an email to the Consultant and copied Busshaus, writing:  "As you read in the report, there are a whole lot of very significant issues. Millions of dollars in unrecorded expenses, outstanding loans, additional tax liabilities, *missing [K]iosks*, missing stores . . . lawsuits, in addition to a massive lack of internal controls for their financial reporting" (emphasis added).  Over the next ten days, Busshaus, Spencer and the International Accounting Firm exchanged a number of emails highlighting the red flags and the International Accounting Firm's inability to get necessary information on DEI.  Spencer also indicated that he would convene a meeting between the International Accounting Firm, DEI's Accounting Firm, and representatives of DEI in an attempt to resolve outstanding issues.

17.     On October 19, 2011, Wizzard issued a press release, drafted by Spencer and reviewed by Busshaus, regarding the progress of acquisition due diligence.  In the press release, Wizzard stated that it "is using a Big Four firm to assist in the efforts, so while the process at times is slow, it is extremely thorough and we are confident that the end result will be a very detailed inspection of the company."

18.     The Consultant and DEI's Accounting Firm met with the International Accounting Firm in an attempt to resolve the outstanding issues, but, as reported by the Consultant to Spencer, these meetings did not "go well." DEI's Accounting Firm was not able to provide information that sufficiently addressed the International Accounting Firm's material concerns regarding DEI's business. The Consultant in turn emailed criticisms of the International Accounting Firm to Spencer, and asserted that the International Accounting Firm was "unreasonable."

19.     On January 10, 2012, the International Law Firm emailed a report to Spencer and Busshaus indicating an inability to locate most of the Kiosks. The next day, Spencer emailed the Consultant and others forwarding the International Law Firm's findings, writing, "I can't imagine a worse report to receive on the day of our board meeting. I don't know what we are going to do now. This is horrible. Please read below emails and then attached file...This is a major setback. I don't even know what to say." Within hours, Spencer forwarded this email exchange to Busshaus.

20.     The International Accounting Firm advised Spencer and Busshaus that Wizzard should perform a physical inspection of the Kiosks. However, rather than engage the International Accounting Firm or the International Law Firm to perform the inspection, Spencer and Busshaus asked the Consultant to conduct site visits.

21.     The Consultant obtained additional information from DEI concerning the Kiosk locations and accompanied an associate from the International Law Firm to confirm the presence at seven locations. On January 12, 2012, the Consultant emailed Spencer to report that "[m]y team found machines at every location," and attached color images of the Kiosks. Upon receiving this email, which included photos of Kiosks, Spencer forwarded it to Busshaus, saying

"Why can't it be easy?  Read below.  But then look at all images attached.  Some are admittedly of the same machines."  Busshaus responded to Spencer minutes later, "You know this is how its (sic) going to be."

22.     On February 1, 2012, the Consultant confirmed the presence of Kiosks at seven additional locations and emailed Spencer the following day, stating, "[e]ach machine was chosen from the random [International Law Firm] list" and that "I can continue this exercise if you like, but I found every serial number I went after at the new address provided . . . ."  Spencer never replied to the e-mail, and the Consultant did not "continue the exercise".

23.     On April 5, 2012, the board approved the merger agreement with DEI.  The merger transaction closed on September 26, 2012.  After the transaction closed, the entity changed its name to FAB.  Spencer became FAB's President and CEO; Busshaus became its CFO; and DEI's founder became the Chairman of FAB's board of directors.  In connection with the closing of the merger, Spencer and Busshaus each received cash bonuses of $100,000 and stock bonuses then valued at approximately $1.3 million.

24.     When the deal closed, FAB issued press releases—drafted and reviewed by Spencer and Busshaus—noting the due diligence conducted by the International Accounting Firm and the International Law Firm.   They failed, however, to mention any of the red flags identified by those firms.

25.     After the merger closed, most of FAB's accounting and financial reporting personnel were located in China, including FAB's China-based Vice President of Finance.  Spencer and Busshaus primarily communicated with FAB's accounting and financial reporting personnel via email, sometimes with the aid of translations provided by a Chinese-speaking

employee.  In those email communications, Spencer and Busshaus regularly corresponded about FAB's Kiosk business and other company metrics.

26.     After the merger, the Kiosks were a consistent focus of the Company's press releases and earnings calls, which Spencer and Busshaus ran and conducted.  In 2012, for example, FAB represented that Kiosks and related Kiosk licenses generated more than 16% of its revenues.  In 2013, FAB reported that the Kiosk-related business, including advertising revenue and the sale of Kiosk licenses, generated about 37% of the Company's revenue.  During FAB's 2012 fourth quarter earnings call, Busshaus and Spencer positively referenced the "90% margins" of the Kiosk business and the ability to scale from 40 to more than 160 cities.  On the earnings call, Spencer said that FAB Kiosks are "the future of the FAB business model and this is where we see the most potential growth going forward...."

27.     However, contemporaneous with these representations, Spencer and Busshaus continued to receive conflicting information about the state of FAB's Kiosk business from the Company's China-based staff.  Less than a month after the merger closed, in October 2012, email exchanges among Spencer, Busshaus, the Consultant, and FAB's accounting and finance personnel discussed the China-based staff's claim that the Company only had 3,832 total Kiosks.  Spencer wrote that "I thought we were over 10,000 [K]iosks.  Is this only inside Beijing?  We've released PR saying over 10k."  An advisor who counseled Wizzard on the DEI acquisition transaction responded to Spencer on October 16, 2012 (copying Busshaus and others), "Yes I know.  I felt it was too aggressive and never wanted it there."  In a subsequent email to Spencer, Busshaus stated, "These numbers are different that [*sic*] what you have been releasing."

28.     A few days later, FAB issued a press release reviewed and approved by Spencer and Busshaus, attached to an October 23, 2012 FAB Form 8-K (signed by Busshaus), titled *FAB*

*Universal Announces Quarterly Kiosk Growth Sees Continued Growth in Intelligent Media Kiosk Business.* In it, FAB claimed to have 11,305 Intelligent Media Kiosks installed and millions in Kiosk-related revenue. The press release states in relevant part:

> FAB Universal (NYSE MKT: FU), a worldwide distributor of digital entertainment, today updated quarterly numbers for FAB's Intelligent Media Kiosk Business in China, reporting impressive growth of 109% in the quarter ending September 30th, versus the same period in 2011. The FAB Kiosk Network grew by 1,436 terminals during this time, versus 688 in the same period for 2011. With an installed base of 11,305 and growing, the network of Media Kiosks continues to rapidly expand.... FAB Intelligent Media Kiosk Revenues for fiscal 2010 was $15.7 million, in fiscal 2011 it was $17.6 million and for the first half of fiscal 2012, $12.6 million....

> "We are very pleased to see such great growth in the most recent quarter for the Media Kiosk Business. We believe that the triple digit growth in Media Kiosks and expansion to over 7,000 franchises leads the way for continued revenue growth and the creation of substantial value for our shareholders," said Chris Spencer, CEO, FAB Universal Corp. "We are even more enthusiastic about FAB's digital media distribution [K]iosk network in China, the world's fastest growing market. In the last 12 months, sales of membership cards have grown to nearly 340,000 with over 300,000 active in the quarter. This creates great opportunities for FAB at a time when mobile computing is driving digital media consumption to the forefront of the entertainment industry."

29.     Additionally, in a December 2, 2012 email, the Consultant expressed frustration to Spencer with the inability of FAB's China staff to provide the most basic Kiosk data. "This issue [] of supporting detail to the published accounting numbers I have been pushing on for many months. Especially the details on [K]iosk locations and growth numbers month by month and city by city (installations and download data). . . . If they really do not have this I want an

explanation why. " In a separate email two days later, the Consultant wrote, "This information is the very core of the business and in China the [K]iosk and member downloads of media products from the [K]iosks is the primary expansion and growth of the core business-media distribution. This information should be readily available. If we publish a number like 10,000 media [K]iosks in 38 cities at the very minimum we should be able to say exactly when they were installed and where all of them [are] on a quarterly basis starting from machine #1 to now." Spencer responded that he "asked for some numbers when I was trying to get [an investor relations employee based in China] to think of some PR ideas. I didn't request the info as much as asked questions to get her to see where to dig and think between fluff and material info. The only two things that matter right now are MONEY and PR."

30.    Spencer specifically noted the importance of releasing data about the Kiosks, remarking in a December 6, 2012 email to FAB personnel in China that "[w]e really need a [press release] for Friday morning []. We are losing credibility at a time when Chinese companies are again being called frauds in the media...They are starting to assume there is no real business if there is no news."

31.    Despite these red flags, Spencer and Busshaus continued to use information provided by Chinese management to make specific representations about the functionality of the Kiosks, the number of operational Kiosks in China, the growth of the Kiosk market, and the revenue potential. For example, on March 18, 2013, FAB issued its Form 10-K for the fiscal year ended December 31, 2012 (the "2012 10-K"). Spencer and Busshaus, who drafted, reviewed, signed, and certified the 2012 10-K, represented the following:

- Ou[r] Intelligent Media Kiosks, based on 61 proprietary intellectual property rights, are ATM style terminals where consumers can download copyright protected music, video games, ringtones, digital books and

movies directly to their cell phones, memory sticks or other mobile storage devices. The Kiosks also run video ads on the high-tech LCD screens and accept payments for utility bills, and credit card bills.

- In 2008, FAB was granted a license by China's Ministry of Commerce to license its business model that has been well received by entrepreneurs throughout the country. FAB has quickly grown its nationwide business network through its license and regional agent programs and to date has expanded to 40 cities with around 8,400 licensees and an installed network count approaching 12,500 Intelligent Media Kiosks.

- FAB [K]iosk is an innovative self-service vending [K]iosk designed and launched by DEI in 2008. The [K]iosks target the millions of mobile and portable device users combin[in]g interactive touch screen and LED display with a large selection of copyrighted content such as music, movies and games. The content is contained on internal hard drives within each terminal thereby eliminating bandwidth download problems associated with the internet and providing content owners with a secure closed system for digital file protection and accurate transparent accounting.

- The terminals are updated and monitored via web-linked electronic communications. There are thousands of licensed digital entertainment content files in each [K]iosk, such as music, movie and TV episodes, which allows the customer to play or download to their portable device or memory card with payment by cash, FAB membership card or ATM card.

32.    Spencer and Busshaus continued to describe the Company's business model as "iTunes meets Redbox meets Netflix."   On a March 19, 2013 earnings call discussing FAB's year-end results, Spencer stated:

"When you think of a FAB [K]iosk, think of a standalone ATM machine that you would see at your local restaurant. These Intelligent Media Kiosks are very elegant and very sophisticated. They are simple to use and allow consumers to purchase copyright protected music, video games, ringtones, digital books, and movies, directly to their cell phones, memory drives or other mobile storage devices. The [K]iosks have TV type screens in them and run paid advertisements and FAB also sells membership cards for the heavy users. We currently have about 3,000 paid memberships. When you put this model together, the best way we can describe it, as we have in the past, is iTunes meets Redbox meets Netflix.

Currently, FAB Universal has over 8,400 licensees with 12,000 [K]iosks in over 40 cities throughout China. That number is way up from where we were before when we first started announcing the number of licensees and the number of [K]iosks about a year ago when we were just getting going with FAB and starting on the due diligence process. This is a strong franchise style network and it continues to grow rapidly, enjoying approximately 80% gross margins in the fourth quarter. As John [Busshaus] just reported, it was actually closer to 90%, I was smoothing it a little bit for some going forward.

Now, as for the future of the brand license and [K]iosk business, the plan is simple, rapid expansion. Right now, we're in 40 cities. There's over 160 cities in China with a population of 1 million people or more. Of the 1.3 billion people in China, half are now living in urban areas. With the cash flow that this business segment generates, we can fund rapid expansion internally. This is the future of the FAB business model and this is where we see the most potential growth going forward, and with 90% margins last quarter, we're obviously very excited about this business. We're looking right now to grow the content that is included in the [K]iosk. As I mentioned before, we're looking with the supermarket and the cinema chains to grow the FAB licensees or the small express type stores. We really feel that things are firing on all cylinders over there and it's moving forward very aggressively and with great margins."

33.     Shortly thereafter, on April 18, 2013, Spencer forwarded an investor complaint about a lack of news to FAB personnel in China, in which the investor wrote: "I am beyond frustration at this point and would like to know if this is a scam." Spencer added, "[Investors] think [FAB] is a 'scam' because there is no news ever." Spencer received a response from a team member in China that someone was working on the numbers, but she didn't have them. "Numbers just show-up by quarter-ends," she said. Seven days later, Busshaus received an email from a FAB employee noting that FAB had added 1,300 Kiosks the prior quarter, increasing the total to 13,800 Kiosks in the network. However, the employee stated that the newly added Kiosks "may not have been installed nor (sic) operated . . . ."

34.     Yet, on May 14, 2013, Spencer and Busshaus claimed in FAB's Form 10-Q for the first quarter ended March 30, 2013 (the "Q1 2013 10-Q") that the Company had an installed network of over 13,800 Intelligent Media Kiosks across China. Spencer and Busshaus reviewed, signed, and certified the Q1 2013 10-Q.

35.     In FAB's Form 10-Q for the second quarter ended June 30, 2013, filed on August 14, 2013, FAB reported that as of June 30, 2013, it had an "installed network base approaching 16,000 Intelligent Media [K]iosks." However, as FAB prepared to issue its third quarter results on November 14, 2013, there continued to be questions about the accuracy of FAB's reported Kiosk numbers. On November 13, 2013, during an email exchange between Spencer, Busshaus, FAB's accounting personnel in China, and another U.S.-based FAB employee, the U.S.-based employee noted that accounting personnel claimed the Company added 2,400 Kiosks that quarter. However, they also claimed that the Company only had 16,820 Kiosks total, which was less than the approximately 18,000 there should be if the second quarter numbers were accurate.

FAB's accounting personnel in China attempted to reconcile the discrepancy by chalking it up to a misunderstanding.

36.     Yet, in FAB's Form 10-Q for the three months ended September 30, 2013, filed on November 14, 2013 (the "Q3 2013 10-Q"), Spencer and Busshaus, who reviewed, signed, and certified the report, represented that FAB had an installed base in excess of 16,000 Kiosks.  The Q3 2013 10-Q included additional representations about the Kiosk's capabilities:

- "FAB Intelligent Media Kiosks, based on 61 proprietary national intellectual property rights, are ATM style terminals where consumers can download copyrighted music, video games, ringtones, digital books and movies directly to their cell phones, memory sticks or other mobile storage devices."

- "[The] FAB [K]iosk is an innovative self-service vending [K]iosk . . . [that] target[s] the millions of mobile and portable device users combin[in]g interactive touch screen and LED display with a large selection of copyrighted content such as music, movies and games."

- "The [Kiosk] content is contained on internal hard drives within each terminal thereby eliminating bandwidth download problems associated with the internet and providing content owners with a secure closed system for digital file protection and accurate transparent accounting."

- "The terminals are updated and monitored via web-linked electronic communications."

- "There are thousands of licensed digital entertainment content files *in each [K]iosk*, such as music, movie and TV episodes" (emphasis added).

37.    In a related Q3 2013 earnings call on November 13, 2013, Spencer made the following representations about the Company's Kiosk business:

- "During the third quarter, we added 2,421 [K]iosks compared to 2,311 [K]iosks in the second quarter. Our installed base is now 16,820 kiosks and 5C brand licenses in 40 first- and second-tier cities throughout China . . . ."

- "Many of you have asked for a map or a list of the exact locations of our 16,820 [K]iosks, as well as full listings of our content offerings. We will be populating our website with more information as it's translated, although it's taking time to complete the translation."

- "As we've said previously, we believe that there is room to expand our network of intelligent [K]iosks to about 200,000 terminals in the other 120 cities in China that we are not currently represented in, and that have a population of over 1 million people."

38.    In November 2013, a market analyst who held a short-position in the Company's stock ("Market Analyst") retained private investigators in China to investigate FAB's operations. Following the investigation, the Market Analyst issued a report entitled "Best Buy Meets iTunes Meets Redbox Meets FRAUD" (emphasis in original). The Market Analyst made a number of allegations about FAB's business. Among them was a claim that FAB had vastly overstated the number of Kiosks it had sold and operated in China. Specifically, the Market Analyst alleged that FAB had no more than 1,600 Kiosks—purportedly the number of Kiosks FAB's suppliers had delivered to FAB. After the release of the Market Analyst report and a series of follow-ups, FAB's stock price plunged and the NYSE halted trading in FAB securities.

39.     Thereafter, FAB issued a series of press releases labeling the Market Analyst allegations as "misleading," "inaccurate," and "defamatory." These press releases were reviewed and approved by Spencer, Busshaus, and FAB management in China. For example, on or about November 15, 2013, FAB issued an announcement (reviewed and approved by Spencer and Busshaus) that stated in relevant part:

> FAB Universal, Inc. . . . today denied the misleading and inaccurate allegations made in a recent report published by [Market Analyst]. The Company announced that it would, as soon as possible, issue a public statement to refute these defamatory remarks and that it expected to be in a position to provide a response shortly.

40.     On or about November 20, 2013, FAB reiterated its denials in a press release reviewed and approved by Spencer and Busshaus, stating that "FAB Universal . . . repeated today its vehement denial of the recent allegations raised by short-sellers in their self-serving 'reports' and reaffirmed its commitment to providing the Company's shareholders with accurate information.

41.     In that same press release, FAB repeated its claim that "FAB delivers media to its customers worldwide through *Intelligent Kiosks*, Retail Stores and Franchises, and online through Apple iTunes and Google Android. . . Sales of digital media are generated *through the [K]iosks networks*, subscription sales for mobile devices, smartphone Apps and Netflix-like subscription models" (emphasis added).

42.     Many of these claims proved to be inaccurate or misleading. After the publication of the Market Analyst report, FAB engaged outside legal counsel to conduct an investigation into the Kiosk business. The law firm, in turn, engaged a consulting firm to conduct a forensic review. FAB summarized the findings of this forensic review in a press release issued on August 12, 2014. Although the consulting firm located a number of the missing Kiosks, the firm also

confirmed the accuracy of Market Analyst's most serious allegations about the Kiosk business, several of which mirrored the initial concerns raised during the DEI merger due diligence. Among other things, the consulting firm found that:

- Only six (or 2.2%) of the 325 Kiosks in the sample reviewed had media download or other "smart" capabilities.

- Nearly all the Kiosks located by the consultant only displayed electronic advertising, and had no media download or other "smart" functionality.

- Only 134 (or 41.2%) of the 325 Kiosks sampled were found to be operational, as most had fallen into disrepair or lacked a power source.

- None of the Kiosks were networked to central servers, as described in the Company's public disclosures.

43.    As FAB acknowledged in its August 12 press release, almost all of the supposedly "Intelligent Media" Kiosks sampled by the consulting firm derived revenue solely from advertising rather than from advertising and media downloads.

44.    From November 13, 2013 (the day before the first report calling the Company's Kiosk disclosures into question) to November 21, 2013 (the day trading was halted by the NYSE), FAB's stock price fell from $5.46 to $3.07.  When trading resumed on the over-the-counter markets on August 12, 2014, the price fell to $1.10.

45.    While engaging in the conduct detailed above, Spencer and Busshaus personally sold FAB stock worth millions of dollars.  From January 2013 through September 2013, Spencer sold 320,830 shares of his FAB common stock for proceeds of over $2 million.   From January 2013 through November 2013, Busshaus sold 287,660 shares of FAB common stock for proceeds of more than $1.2 million.

46.     In the period when Defendants sold their shares, FAB's stock price was inflated as a result of the misconduct alleged in this Complaint, allowing Defendants to unjustly benefit to the detriment of FAB's investors.  Following the Market Analyst's fraud accusations against the Company, FAB's stock price dropped significantly.

## CLAIM FOR RELIEF

### FRAUD IN THE OFFER OR SALE OF SECURITIES
#### Violations of Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)]

47.     The Commission repeats and re-alleges Paragraphs 1 through 46 of the Complaint as if fully set forth herein.

48.     By engaging in the conduct described herein, Spencer and Busshaus, directly or indirectly, singly or in concert, in the offer or sale of securities, by use of the means or instrumentalities of interstate commerce or of the mails, acting negligently, obtained money or property by means of untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

49.     By engaging in the conduct described herein, Spencer and Busshaus directly or indirectly, singly or in concert, in the offer or sale of securities, by use of the means or instrumentalities of interstate commerce or of the mails, acting negligently, engaged in transactions, practices, and courses of business which operate as a fraud or deceit upon purchasers, prospective purchasers, and other persons.

50.     Thus, by engaging in the conduct alleged in this Complaint, Spencer and Busshaus violated, and unless enjoined will continue to violate, Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(2) and 77q(a)(3)].

## **PRAYER FOR RELIEF**

For these reasons, the Commission respectfully requests that the Court enter a final judgment:

(a)     Finding that each of the Defendants committed the violations alleged in this complaint;

(b)     Permanently enjoining Defendants Spencer and Busshaus from violating, directly or indirectly, Section 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)];

(c)     Ordering each Defendant to disgorge all ill-gotten gains, benefits, and unjust enrichment obtained by reason of the unlawful conduct alleged in this Complaint, plus prejudgment interest on that amount;

(d)     Ordering each Defendant to pay an appropriate civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], in the amount determined by the Court;

(e)     Retaining jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

(f)     Granting all other and further relief as this Court deems just and appropriate.

Dated: September 30, 2019                              Respectfully submitted,


                                                        MATTHEW J. GULDE
                                                        Illinois Bar No. 6272325
                                                        United States Securities and Exchange Commission
                                                        Fort Worth Regional Office
                                                        Burnett Plaza, Suite 1900
                                                        801 Cherry Street, Unit #18
                                                        Fort Worth, TX 76102-6882
                                                        Ph: 817-978-1410
                                                        Fax: 917-978-4927
                                                        guldem@sec.gov

ATTORNEY FOR PLAINTIFF UNITED STATES
SECURITIES AND EXCHANGE COMMISSION

Of Counsel:

D. Thomas Keltner
Texas Bar No. 24007474
United States Securities and Exchange Commission
Fort Worth Regional Office
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX 76102-6882
Ph: 817-978-3821
Fax: 917-978-2700
keltnerd@sec.gov